IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION

DEANA TILLMAN,

        Plaintiff,

vs.                                                                CASE NO. 1:08-cv-43-MP-GRJ

MICHAEL J. ASTRUE,
Commissioner of Social Security

        Defendant.

_____/

## REPORT AND RECOMMENDATION

Plaintiff appeals to this Court from a final decision of the Commissioner of Social Security (the "Commissioner") denying Plaintiff's application for a period of disability and disability insurance benefits pursuant to Title II of the Social Security Act (the "Act") and for Supplemental Security Income benefits under Title XVI of the Act. (Doc. 1.) The Commissioner has answered (Doc. 19), and both parties have filed briefs outlining their respective positions. (Docs. 25 & 28.) Plaintiff has also filed a Reply to the Commissioner's response. (Doc. 31.) For the reasons discussed below, the Commissioner's decision is due to be **AFFIRMED**.

## I. PROCEDURAL HISTORY

On June 27, 2005 Plaintiff filed an application for a period of disability, disability insurance benefits and supplemental security income benefits, alleging a disability as of

January 1, 2004.[1]  (R. 83.)  Plaintiff's application was denied initially and on

reconsideration. (R. 28-29, 36-37, 43-44, 46-47, 418-30, 489-90.)  On July 11, 2007,

following a hearing, an administrative law judge ("ALJ") rendered a decision in which he

found that Plaintiff was not under a "disability" as defined in the Act.  (R. 13-24.)

Plaintiff then timely appealed the denial of her application to the Appeals Council and,

on January 25, 2008, the Appeals Council denied Plaintiff's request for review. (R. 6-8,

12.)  Plaintiff then filed this action seeking review of the final decision of the

Commissioner.  (Doc. 1.)

On June 3, 2008, the Commissioner filed a motion to remand this case due to

his inability to create a proper hearing record of the administrative hearing as a result of

a partially blank tape recording.  (Doc. 4.)  On August 6, 2008, this Court remanded this

case to the Commissioner pursuant to sentence six of 42 U.S.C. § 405(g).  (Doc. 6; R.

446, 483-89.)  On October 15, 2008, the Appeals Council vacated the ALJ's previous

decision and remanded the matter to the Commissioner for another administrative

hearing pursuant to this Court's order.  (R. 486-88.)  A second administrative hearing

was held on January 23, 2009 and, on March 23, 2009, an ALJ rendered a decision in

which he found that Plaintiff was not under a "disability" as defined in the Act.  (R. 443-

60, 463-82.)  On October 27, 2010 the Commissioner then filed his Answer in this

action.  (Doc. 19.)

---

[1] On June 17, 2008, Plaintiff filed another application for disability insurance benefits and
Supplemental Security Income benefits, which was subsequently consolidated with her original application
on remand to the Commissioner.  (R. 489, 732-36.)

2

## II.  STANDARD OF REVIEW

The Commissioner's findings of fact are conclusive if supported by substantial evidence.[2] Substantial evidence is more than a scintilla, i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion.[3]

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision.[4] The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision.[5] However, the district court will reverse the Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law.[6]

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be

---

[2] *See* 42 U.S.C. § 405(g) (2000).

[3] Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995) (citing Walden v. Schweiker, 672 F.2d 835, 838 (11th Cir. 1982) and Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971)); *accord,* Edwards v. Sullivan, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

[4] Edwards, 937 F.2d at 584 n.3; Barnes v. Sullivan, 932 F.2d 1356, 1358 (11th Cir. 1991).

[5] Foote, 67 F.3d at 1560; *accord,* Lowery v. Sullivan, 979 F.2d 835, 837 (11th Cir. 1992) (holding that the court must scrutinize the entire record to determine reasonableness of factual findings); Parker v. Bowen, 793 F.2d 1177 (11th Cir. 1986) (finding that the court also must consider evidence detracting from evidence on which the Commissioner relied).

[6] Keeton v. Dep't Health and Human Servs., 21 F.3d 1064, 1066 (11th Cir. 1994).

expected to result in death, or has lasted or can be expected to last for a continuous period of not less than twelve months.[7]  The impairment must be severe, making Plaintiff unable to do her previous work, or any other substantial gainful activity which exists in the national economy.[8]

The ALJ must follow five steps in evaluating a claim of disability.[9]  First, if a claimant is working at a substantial gainful activity, he is not disabled.[10]  Second, if a claimant does not have any impairment or combination of impairments which significantly limit his physical or mental ability to do basic work activities, then he does not have a severe impairment and is not disabled.[11]  Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, he is disabled.[12]  Fourth, if a claimant's impairments do not prevent him from doing past relevant work, he is not disabled.[13]  Fifth, if a claimant's impairments (considering his residual functional capacity ("RFC"), age, education, and past work) prevent him from doing other work that exists in the national economy, then he is disabled.[14]

---

[7] 42 U.S.C. §§ 416(i), 423(d)(1); 20 C.F.R. § 404.1505 (2005) (All further references to 20 C.F.R. will be to the 2005 version unless otherwise specified.).

[8] 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-404.1511.

[9] 20 C.F.R. §§ 404.1520, 416.920. The claimant has the burden of proving the existence of a disability as defined by the Social Security Act. Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991).

[10] 20 C.F.R. § 404.1520(b).

[11] 20 C.F.R. § 404.1520(c).

[12] 20 C.F.R. § 404.1520(d).

[13] 20 C.F.R. § 404.1520(e).

[14] 20 C.F.R. § 404.1520(f).

The burden of proof regarding the plaintiff's inability to perform past relevant work initially lies with the plaintiff.[15]  The burden then temporarily shifts to the Commissioner to demonstrate that "other work" which the claimant can perform currently exists in the national economy.[16]  The Commissioner may satisfy this burden by pointing to the Medical-Vocational Guidelines (the "Grids") for a conclusive determination that a claimant is disabled or not disabled.[17]

However, the ALJ should not exclusively rely on the Grids when "the claimant has a non-exertional impairment which significantly limits his or her basic work skills or when the claimant cannot perform a full range of employment at the appropriate level of exertion."[18]  In a situation where both exertional and non-exertional impairments are found, the ALJ is obligated to make specific findings as to whether they preclude a wide range of employment.[19]

The ALJ may use the Grids as a framework to evaluate vocational factors so

---

[15] Walker v. Bowen, 826 F.2d 996, 1002 (11th Cir. 1987); see also Doughty v. Apfel, 245 F. 3d 1274, 1278 (11th Cir. 2001).

[16] Doughty, 245 F.3d at 1278 n.2. In Doughty the court explained this burden shifting as follows:

In practice, the burden temporarily shifts at step five to the Commissioner. The Commissioner must produce evidence that there is other work available in significant numbers in the national economy that the claimant has the capacity to perform.  In order to be considered disabled, the claimant must then prove that he is unable to perform the jobs that the Commissioner lists. The temporary shifting of the burden to the Commissioner was initiated by the courts, and is not specifically provided for in the statutes or regulations.) (Internal citations omitted).

[17] Walker, 826 F.2d at 1002 ("[T]he grids may come into play once the burden has shifted to the Commissioner to show that the claimant can perform other work.").

[18] Wolfe v. Chater, 86 F.3d 1072, 1077 ( 11th Cir. 1996). See Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir. 1999); Walker, 826 F.2d at 1003 ("The grids may be used only when each variable on the appropriate grid accurately describes the claimant's situation.").

[19] Walker, 826 F.2d at 1003.

long as he introduces independent evidence of the existence of jobs in the national

economy that the claimant can perform.[20]  Such independent evidence may be

introduced by a Vocational Expert's ("VE") testimony, but this is not the exclusive

means of introducing such evidence.[21]  Only after the Commissioner meets this burden

does the burden shift back to the claimant to show that he or she is not capable of

performing the "other work" as set forth by the Commissioner.

### III.  SUMMARY OF THE RECORD

The Plaintiff challenges the ALJ 's treatment of the medical opinions expressed

by consulting physician Linda Abeles, Ph.D. and the ALJ's alleged failure to address

Plaintiff's credibility regarding her subjective complaints of her mental symptoms and

limitations.  The Court will focus its discussion of the record on those issues.

### A.    Personal Background

Plaintiff, born in December 1962, was 46 years old on the date of the

administrative hearing.  (R. 467.)  Plaintiff has a high school special education diploma.

(*Id.*)

### B.    Medical Evidence in the Record

On April 26, 1996, Plaintiff was hospitalized for depression at Shands Hospital at

the University of Florida in Gainesville, Florida, where she was then employed as a

housekeeper.  (R. 177-80.)  Her chief complaint on admission was that "I'm scared to

be alone because I don't know what I'll do.  I don't want to lose my marriage."  (R. 177.)

---

[20] Wolfe, 86 F.3d at 1077-78.

[21] *See id.*

6

Plaintiff reported that she was in a problematic marriage, that she had superficially cut her wrists two weeks before and that previously she had also broken a window with her fist out of anger.  (R. 177-78.)  An IQ test showed that Plaintiff had low average to below-average intellectual functioning.  (R. 179.)  Further psychological testing indicated that Plaintiff tended to exaggerate her symptoms.  (R. 179.)  Plaintiff was discharged on May 2, 1996 with diagnoses of Adjustment Disorder with depressed mood, resolved, with dependent and borderline personality traits, and she was assigned a Global Assessment of Functioning ("GAF") of 51-60.  (R. 177, 180.)

In 1993, Plaintiff had carpal tunnel release surgery on her right hand.  (R. 207.)  On October 1, 1998, Plaintiff underwent a neurological consultation by George Feussner, M.D. for similar complaints in her left hand.  (R. 207-08.)  She complained of cervical pain and stiffness, left arm and hand pain with reduced grip and numbness and tingling, lumbar pain radiating down her left leg, left leg swelling, numbness of her second toe and left foot pain.  (R. 207.)  Physical exam revealed reduced range of motion of the cervical spine, paraspinous muscle tenderness and spasms, positive Tinel's sign at the left wrist associated with a reduction in grip strength and a sensory distribution compatible with median nerve injury.  (*Id.*)  Nerve conduction study and EMG testing revealed severe bilateral median nerve entrapment of the wrists and denervation activity of the opponens pollicis, biceps and triceps. (R. 201-03.)

On November 2, 1998, Plaintiff was evaluated by Eric Scott, M.D. of Florida Neurosurgical Associates in Gainesville.  (R. 217.)  Dr. Scott concurred with Dr. Feussner's findings of left carpal tunnel syndrome and left C7 radiculopathy and recommended a left carpal tunnel release.  (R. 218.)  On November 24, 1998, Plaintiff

underwent a left carpal tunnel release.  (R. 216.)  Over the next several months,
Plaintiff did not experience further problems with her left hand and she successfully
returned to work.  (R. 213-17.)  In February 1999, however, she began to experience
numbness and tingling in her right hand again and she was also diagnosed with
fibromyalgia. (R. 212.)

On March 3, 2000, Plaintiff presented to Dr. Scott's office with complaints of
chronic pain, numbness and tingling in her left hand.  (R. 211.)  His diagnoses were
persistent left hand pain and numbness, swelling bilateral hands and burning sensation
and swelling of both feet, left worse than right.  (*Id*.)

A second nerve conduction study was performed by Dr. Feussner on March 24,
2000, which again revealed median nerve entrapment at the left wrist.  (R. 206.)  EMG
testing performed by Dr. Feussner on April 17, 2000 showed minimal evidence of C-7
radiculopathy, an improvement from the studies performed two years earlier.  (*Id*.)

On March 20, 2002, Plaintiff visited Dr. Scott again with complaints of bilateral
hand pain.  (R. 210.)  Dr. Scott diagnosed status post bilateral carpal tunnel release
with recurrent symptoms, possible tendonitis of the right hand, and history of cervical
radiculopathy.  (R. 210.)

On April 18, 2002, Plaintiff returned to Dr. Feussner for a follow up visit.  (R.
205.)  Examination reflected reduced range of motion of the cervical spine in all
directions with pain and tenderness of the cervical paraspinous muscles, indicating
palpable spasm. (*Id*.) She also had tenderness over the dorsolateral right wrist and had
positive Tinel's signs at both wrists associated with reduction in grip strength and

sensory distribution compatible with a median nerve injury. (*Id*.)  Diagnoses were bilateral median nerve entrapment at the wrists, left worse than right; tenosynovitis, right wrist; and minimal left C7 nerve root irritation.  (*Id*.)

Plaintiff visited the Family Medical and Dental Centers clinic in Hawthorne, Florida (the "Clinic") in April, October and November of 2003 complaining of pain in her hands and back, fatigue, dizziness and depressive symptoms. (R. 289-95.)  She was diagnosed with depression and sciatica on her right side, both of which improved with medication.  (*Id.*)  On June 8, 2004, Plaintiff again presented to the Clinic with depressive symptoms, noting that her depression had improved with Paxil but that she still cried frequently and was also experiencing some swelling in her hands. (R. 287, 711.)  On June 17, 2004, Plaintiff reported to the Clinic complaining of further depressive symptoms, back pain and a burning pain in her right buttock.  (R. 286, 710.)  Physical examination revealed that she was positive for tenderness in the paravertebral spine with decreased range of motion and Plaintiff was diagnosed with anxiety, depression and chronic lower back pain.  (*Id.*)

On July 22, 2004, Plaintiff reported to the Clinic with cough and congestion, stating that she was "feeling much better."  (R. 281, 706.)  On August 2, 2004, Plaintiff reported to the Clinic with itchiness on her left arm, along with continued depression and anxiety.  (R. 278, 705.)  Plaintiff said that her antidepressant medication (Zoloft) was helping, although she was still experiencing "some anxiety," so the dosage was adjusted.  (*Id.*)  Plaintiff returned to the Clinic on September 22, 2004, complaining of symptoms of carpal tunnel syndrome, a sore tongue, and some aching and swelling.

(R. 277, 704.)  She was prescribed Lortab for breakthrough pain.  (*Id.*)

A week later, on September 30, 2004, Plaintiff presented to the Clinic with burning in her chest and throat and was diagnosed with gastro-esophageal reflux disease ("GERD") and was prescribed Prevacid.  (R. 276, 703.)  Plaintiff returned on December 20, 2004 to address complaints of upper abdominal pain and bloating and was diagnosed with GERD and carpal tunnel syndrome. (R. 274, 701.)

On June 15, 2005, Plaintiff presented at the Clinic with back pain and reported that she had suffered a miscarriage in March.  (R. 256, 699.) The doctor diagnosed depression and chronic low back pain and started Plaintiff on Wellbutrin.  (*Id.*)  A week later, on June 22, 2005, Plaintiff reported that her depressive symptoms had improved. (R. 255, 698.)  On July 6, 2005, Plaintiff went to the Clinic about headaches, dizziness, and bumps on her breasts. (R. 254, 697.) The doctor diagnosed anxiety and depression, provided medication, and noted that Plaintiff had failed to show up for a recent psychotherapy appointment.  (*Id.*)  On July 9, 2005, Plaintiff scheduled another psychotherapy appointment for July 25, 2005, stating that she had anxiety and depression and had been subjected to domestic abuse.  (R. 249.)  Plaintiff, however, again failed to show up for the July 25 psychotherapy appointment.  (R. 248.)

On August 9, 2005, Andres Nazario, Jr., Ph.D. conducted a consultative psychological examination of Plaintiff.  (R. 315-18.)  Plaintiff reported to Dr. Nazario that she had a history of depression and had been previously hospitalized for depression. (R. 315-16.) Dr. Nazario diagnosed Plaintiff as suffering from dysthymic disorder, early onset, and concluded that she appeared to be a woman of low to low average intelligence.  (R. 317.)  He also noted that Plaintiff appeared to be able to concentrate,

10

understand and follow directions, interact with others appropriately, and capable of managing her own financial affairs.  (R. 317-18.)

Lance I. Chodosh, M.D., performed a consultative physical examination of Plaintiff on August 16, 2005.  (R. 334-40.)  Dr. Chodosh noted that Plaintiff had carpal tunnel in both hands without any physical signs of impairment, chronic low back pain, and chronic depression, which was being treated with antidepressant medication. (R. 334, 337.)  Dr. Chodosh noted that Plaintiff was independent in her activities of daily living, could sit fairly well, was able to lift 15 to 25 pounds occasionally, but had some difficulty stooping and squatting. (R. 334-35.)  Dr. Chodosh opined that Plaintiff could walk, stand, and sit normally, stoop, lift, carry, squat, kneel, and crawl, and that she would be able to comprehend and follow directions and probably was able to relate normally to others. (R. 337.)  Dr. Chodosh noted Plaintiff's complaints of chronic pain, but added that the etiology of the pain was unclear, as Plaintiff showed no physical signs of impairment. (*Id.*)

Plaintiff's next visit to the Clinic took place on December 15, 2005, when she was treated for pelvic pain and pain in her hands and knees. (R. 406, 616.)  On March 8, 2006, Plaintiff was treated for depression, pelvic pain, and GERD. (R. 405, 615.)  Five months later, on August 15, 2006, Plaintiff reported to the Clinic feeling anxious and depressed, and her prescription for Zoloft was changed to Lexapro. (R. 404, 614.)  On a follow up visit on August 28, 2006, Plaintiff reported that she was taking her medicines as prescribed and that she was feeling better.  (R. 613.)  On another visit on September 26, 2006, she complained of tingling and numbness in her hands and that she was feeling insect bites on her arms.  (R. 402, 612.)  On October 26, 2006, she

11

presented with complaints of wrist pain and limited mobility, which were supported by

positive Phalen and Tinel's signs.  (R. 401, 611.)  On March 1, 2007, Plaintiff was given

Prevacid for stomach and back pain.  (R. 395.)

On March 27, 2007, George Maida, Ph.D., a clinical psychologist, completed a

mental status examination with intellectual assessment of Plaintiff at the request of

Plaintiff's then-counsel.  (R. 371-89).  Dr. Maida determined that Plaintiff had marked

restrictions in her activities of daily living, difficulties in maintaining concentration,

persistence or pace, extreme difficulties in maintaining social functioning, and four or

more episodes of decompensation, each of extended duration.  (R. 388.)  He

concluded that her intellectual functioning was in the retarded to low borderline range

and that her GAF was 40.  (R. 374.)  He diagnosed her with borderline personality

disorder, depression and anxiety.  (R. 374-75.)

On May 1, 2007, Plaintiff reported to the Clinic for refills and complaining of a

possible urinary tract infection. (R. 605). On May 30, 2007, Plaintiff presented at the

Clinic to discuss the results of a pelvic ultrasound.  (R. 604.)  On October 8, 2007,

Plaintiff complained of painful urination and was diagnosed with hyperlipidemia. (R.

603.)  On March 14, 2008, Plaintiff returned to the Clinic for refills and stated that she

had twisted her ankle three months earlier.  (R. 602.)

On September 17, 2008, Plaintiff reported to the Clinic with knee pain.  (R. 696).

Plaintiff was advised to take over-the-counter medication for pain and exercise as

tolerated.  (*Id.*)  On September 25, 2008, Plaintiff returned to the Clinic with knee pain

and was referred to physical therapy. (R. 695.)  The progress notes for that visit

reflected that Plaintiff had been taking Wellbutrin and Lexapro in the past, but that she

12

had stopped taking those medications.  (*Id.*)  On November 2, 2008 Plaintiff returned to

the Clinic and reported insomnia and fatigue, but denied depressed thoughts and the

progress notes reflect that her depression was suboptimal and that her insomnia was

likely secondary to her depression.  (R. 702.)  Her Zoloft dosage was increased and she

was also given a prescription for Restoril.  (*Id.*)

On November 17, 2008 Dr. Linda Abeles, Ph.D. performed a consultative

psychological examination of Plaintiff.  (R. 668.)  Dr. Abeles conducted a clinical

interview of Plaintiff and then administered a mental status examination.  (*Id.*)  She

"estimated that the claimant is functioning in the borderline to low average range of

intelligence."  (R. 669.)  Dr. Abeles concluded that Plaintiff appeared to be suffering from

major depressive, pain and personality disorders.  (R. 670.)  She also wrote that

Plaintiff's "current level of psychological functioning would probably preclude her from

obtaining or maintaining employment."  (*Id.*)  Dr. Abeles further stated that Plaintiff could

benefit from a referral to the Office of Vocational Rehabilitation to assist her in obtaining

employment and recommended that Plaintiff be referred for ongoing mental health care.

(*Id.*)  Her ultimate conclusion was that Plaintiff's prognosis for future success in the

workplace was fair if her recommendations were followed.  (*Id.*)

On November 22, 2008, Eftim Adhami, M.D. completed a medical examination of

Plaintiff.  (R. 671-72.)  Dr. Adhami diagnosed Plaintiff with obesity, hyperlipidemia,

GERD, mild chronic depression under treatment, degenerative arthritis in her right knee,

and some left hand/wrist pain due to carpal tunnel syndrome.  (R. 672.)  He noted that

Plaintiff's gait and muscle strength were normal, that her mood, judgment, and

expression were normal and that no points of fibromyalgia were detected.  (R. 671.)

On November 25, 2008, Lauriann Sandrik, Psy.D. completed a Mental Residual Functional Capacity Assessment and Psychiatric Review Technique of Plaintiff.  (R. 676-93.)  As far as Plaintiff's mental RFC, she concluded that Plaintiff was moderately limited in (i) her ability to understand and remember detailed instructions, (ii) the ability to carry out detailed instructions, (iii) the ability to maintain attention and concentration for extended periods, and (iv) the ability to set realistic goals or make plans independently of others.  (R. 676-77.)  Dr. Sandrik concluded that although Plaintiff's depression, pain and personality issues may interfere with her ability to complete complex tasks and maintain concentration for prolonged periods of time, that Plaintiff appeared mentally capable of completing simple, routine tasks in an adequate time frame and of at least superficially appropriate social interactions in a workplace setting. (R. 678.)

In the Psychiatric Review Technique that she completed, Dr. Sandrik noted that Plaintiff had three medically determinable impairments that did not satisfy the relevant diagnostic criteria, specifically major depressive disorder, a pain disorder and a personality disorder NOS, with dependent traits.  (R. 681, 686-87.)  As far as functional limitations, she concluded that Plaintiff had mild restriction of her activities of daily living, mild difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence or pace, and no episodes of decompensation of extended duration.  (R. 690.)

On November 25, 2008, Plaintiff visited Meridian Behavioral Healthcare for a psychiatric evaluation on a referral from the Florida Department of Children and Families. (R. 747-49.)  The diagnosis was moderate major depressive disorder,

14

recurrent episodes.  (R. 749-50.)  On December 8, 2008, Plaintiff participated in a psychological interview at Meridian. (R. 754-55.)  She reported that " 'I've been battling depression, [and] have the blues.  I'm a big hearted caring person.'"  (R. 755.) Provisional diagnoses were to rule out Adjustment Disorder with moderate depression and also to rule out Depressive Disorder and Dysthymic disorder.  (*Id.*)

On December 15, 2008, Plaintiff met with Lily S. Rocha, M.D. for a consultative examination at the request of Plaintiff's counsel.  (R. 724-31.)  Dr. Rocha diagnosed "[i]ntractable and persistent migraines," dyslexia, depression and anxiety, bilateral carpal tunnel syndrome with failure of bilateral carpal tunnel release, right knee chondromalacia, right hip sciatica, and bilateral heel spurs. (R. 725.)  She further noted that Plaintiff's "inability to stand or walk for any prolonged period of time accompanied by fine dexterity limitations as well as uncontrollable migraines that happen with no warning all interfere with this patient's ability to function for eight hours per day five days per week." (*Id.*)  Dr. Rocha did note, however, that the frequency and length of contact that she had with the Plaintiff was only 20 minutes.  (R. 727.)

On January 21, 2009, Plaintiff presented at the Clinic for refills.  (R. 742.)  The doctor diagnosed hyperlipidemia, knee pain, GERD, depression, and anxiety, and noted that most (more than 50%) of the appointment was spent counseling Plaintiff.  (*Id.*)

**C.   Hearing Testimony**

Plaintiff testified at her second administrative hearing.  She testified that she was 46 years old as of the date of her second administrative hearing on January 23, 2009. (R. 467.)  She testified that she has not worked, aside from a brief period in 2005, due to

15

her depression, carpal tunnel syndrome in both hands, problems focusing, bone spurs in her feet, fibromyalgia and a problem with her right sciatic nerve.  (*Id.*)  Plaintiff testified that she has problems working with money and with performing math because she is dyslexic, which causes her to mix up numbers and the denomination of coins.  (R. 468-69.)  She was let go from a position as a cashier at Dollar General because she kept making errors with respect to her cash register.  (R. 469.)

Plaintiff further testified to a number of physical issues that she suffers.  With respect to her hands, she testified that she cannot hold on to things and that, if she tries to do so, her hands become numb and start to tingle.  (R. 469.)  She stated that she often drops things without realizing that she has lost the strength in her hands and that her wrists are regularly painful.  (R. 471.)

Plaintiff also testified to a number of psychological symptoms.  Plaintiff testified that she has trouble remembering things, like her doctor's appointments, and that her concentration is not very good, which leads her to lose track of the conversation when people are speaking to her.  (R. 472.)  She also testified that she tends to isolate herself from other people, that she frequently feels stressed out and anxious, and that she frequently becomes angry when other persons would not.  (R. 472-73.)  When asked by the ALJ what specifically stresses her out, she replied that her inability to focus and to do the things that others can do causes her to feel that the world is ending.  (R. 473.)

V. David Pigue, a VE, also testified at the administrative hearing.  The ALJ described a hypothetical individual with the following occupational profile: limited to low stress work; simple on skill, with only one, two or three instructions; lifting or carrying 10 pounds frequently and 20 pounds occasionally; no restrictions on sitting but limited to six

hours standing in an eight hour workday; avoid frequent ascending and descending of stairs; avoid pushing and pulling motions with the lower extremities but can perform pushing and pulling motions with the upper extremities within the previously mentioned weight restrictions; no frequent use of the hands and fingers with gross and fine manipulation; avoid hazards in the workplace; and occasional balancing, stooping, crouching, and crawling, but no climbing.  (R. 475-76.)  With respect to psychological restrictions, the ALJ asked the VE to assume that the hypothetical individual  "has depression or psychologically based symptoms which affects her ability to concentrate upon complex or detailed tasks, but she would remain capable of understanding and remembering and carrying out simple job instructions."  (R. 476.)

The ALJ then asked the VE whether the individual described by the ALJ in his hypothetical would be able to perform the positions of callout operator, tube operator and charge account clerk, which the VE from Plaintiff's earlier administrative hearing had identified could be performed by an individual with Plaintiff's limitations. (R. 476.)  The VE replied that the hypothetical individual could not perform the charge account clerk position and noted that the tube operator position had become obsolete, and therefore both positions should be excluded.  (R. 477.)  The VE further testified, however, that such a hypothetical individual would be able to perform the callout operator position. The VE also identified survey worker and taxicab starter as two other positions that the hypothetical individual could perform.  (R. 477-78.) With regard to the survey worker position, the VE opined that there are 3,559 such jobs in Florida and 48,900 in the national economy, while there are 7,525 taxicab starter positions in Florida and 138,495 in the national economy.  (R. 478.)

### D.    Findings of the ALJ

The ALJ determined that Plaintiff met the insured status requirements of the Social Security Act through June 30, 2010.  (R. 448.)  He further determined that Plaintiff had not engaged in substantial gainful work activity since January 1, 2004, her alleged disability onset date.  (R. 449.)  At Step Two, he concluded that Plaintiff had the following severe combination of impairments: "bilateral carpal tunnel syndrome complaints with a history of bilateral carpal tunnel releases, obesity, migraine headaches, mild mental functional limitations secondary to dysthymia, depression, an anxiety disorder with panic attacks, and a borderline personality disorder."  (R. 454.)  At Step Three, he concluded that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments.  (*Id.*)

With respect to Plaintiff's residual functional capacity, the ALJ determined that Plaintiff retained the RFC to perform a significant range of sedentary to light work.  (R. 455.)  As part of his RFC finding, the ALJ concluded that Plaintiff's medically determinable impairments could reasonably be expected to cause Plaintiff's alleged symptoms but that Plaintiff's statements concerning the intensity, persistence and limiting effects of her symptoms were generally not credible to the extent that they were inconsistent with his RFC assessment.  (R. 456.)  Based on his RFC finding, the ALJ concluded that Plaintiff was unable to perform any of her past relevant work.  (*Id.*)

The ALJ then proceeded to Step Five.  (*Id.*)  At Step Five the ALJ concluded that, considering Plaintiff's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that Plaintiff can perform.  (*Id.*)  In making this determination, the ALJ relied on the Grids.  (*Id.*)  He noted that Plaintiff was

46 years old as of her second administrative hearing, that she had at least a high school education (although she had attended some special education classes in school) and that she is able to communicate in English.  (*Id.*)  He thus concluded that, based on her RFC for a wide range of sedentary to light work, and considering the Plaintiff's age, education, and work experience there are jobs that exist in significant numbers in the national economy that the Plaintiff can perform and therefore the Plaintiff was not disabled. (R. 459-60.)

## IV.  **DISCUSSION**

Plaintiff contends that the ALJ erred in not properly considering the medical opinions expressed by consulting physician Dr. Linda Abeles, Ph.D. in her report. Secondly, Plaintiff argues that the ALJ erred in not finding Plaintiff's subjective complaints of mental symptoms and limitations fully credible.   The Court will address each of the two alleged grounds for error in turn.

### A.      **The ALJ's Treatment of Dr. Abeles's Report**

Plaintiff's first argument is that the ALJ erred by "fail[ing] to address the weight he gave to Dr. Abeles' opinions regarding the severity of Ms. Tillman's mental impairments." (Doc. 25 p. 15.)  Plaintiff contends that the ALJ's failure to address Dr. Abeles' opinions rendered the ALJ's written decision legally deficient and unsupported by substantial evidence.  The Court disagrees.

Dr. Abeles' opinions are contained in a report she prepared on November 17, 2008 after performing a consultative psychological examination of Plaintiff.  (R. 668.)  Dr. Abeles conducted a clinical interview of Plaintiff and then administered a mental status examination.  (*Id.*)  She "estimated that the claimant is functioning in the borderline to

19

low average range of intelligence." (R. 669.) Dr. Abeles concluded that Plaintiff appeared to be suffering from major depressive, pain and personality disorders. (R. 670.)

Plaintiff points to Dr. Abeles's conclusory statement in her report that Plaintiff's functioning "would probably preclude her from obtaining or maintaining employment" as support for her argument that the ALJ failed to address the weight he gave to Dr. Abeles' opinions. The problem with this argument is that the ALJ is required only to address the opinion of medical sources, like Dr. Abeles, with regard to medical opinions on Plaintiff's mental health and not conclusory opinions concerning whether a claimant is disabled or is able to obtain employment. Whether Plaintiff suffers from a disability or whether Plaintiff could obtain employment are matters reserved to the Commissioner and therefore the ALJ is not required to give these non-medical opinions any weight. See 20 C.F.R. § 404.1527(e)(1)("We are responsible for making the determination or decision about whether you meet the statutory definition of disability.... A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled."); Broz v. Astrue, No. 3:07-cv-204-RV-EMT, 2008 WL 1995084, at *10 (N.D. Fla. May 5, 2008)("The opinion by a treating physician that a patient is 'unable to work' or 'disabled' is not dispositive for purposes of Social Security claims.... [T]he ultimate question of whether there is disability or inability to work is reserved to the Commissioner.")

Accordingly, Dr. Abeles's statement that Plaintiff's psychological functioning would preclude Plaintiff from obtaining or maintaining employment is thus not conclusive on the issue of whether Plaintiff was operating under a disability for purposes of the Act.

20

The Court, therefore, concludes that the ALJ did not err in failing to agree with Dr. Abeles's statement that Plaintiff's impairments would preclude her from finding employment.

Moreover – and Contrary to Plaintiff's argument -  the ALJ specifically addressed and thoroughly discussed the medical conclusions expressed by Dr. Abeles in her report.  Indeed, the ALJ included in his evaluation of Plaintiff's RFC the findings expressed by Dr. Abeles in her report.  Consistent with Dr. Abeles' opinion the ALJ included a mild mental functional limitation due to dysthymia in the hypothetical that he proposed to the VE.[22]  (R. 476.)  Accordingly, because the ALJ included Dr. Abeles's opinions regarding Plaintiff's mental impairments in his written decision the ALJ did not fail to address Dr. Abeles' opinion and did not commit error.

**B.     Plaintiff's Credibility**

Plaintiff also argues that the ALJ erred in not finding Plaintiff's statements fully credible regarding her mental symptoms and limitations.  According to Plaintiff, the ALJ's credibility analysis concerning Plaintiff's mental symptoms and limitations consisted only of a fairly superficial statement that Plaintiff's symptoms were not as severe as she reported. Further, Plaintiff suggests that the ALJ did not evaluate the factors set forth in 20 C.F.R. § 404.1529 as he was required to do and that the ALJ failed to articulate specific reasons to support his credibility finding as to Plaintiff's mental symptoms and limitations.

---

[22] The ALJ's specific statement to the VE at the administrative hearing regarding the mental functional limitation imposed by Plaintiff's depression was: "Assume the individual has depression or psychologically based symptoms which affects her ability to concentrate upon complex or detailed tasks, but she would remain capable of understanding and remembering and carrying out simple job instructions."  (R. 476.)

Pursuant to 20 C.F.R. § 404.1529(c)(3), in evaluating the credibility of a claimant's subjective complaints, an ALJ is required to consider all evidence regarding the intensity, persistence and functional limitations imposed by the claimant's symptoms, including the claimant's own statements as well as the medical signs and the laboratory findings contained in the medical record.  If an ALJ discredits a claimant's subjective testimony regarding the claimant's pain or other symptoms, the ALJ must articulate explicit and adequate reasons for doing so.  Wilson v. Barnhart, 284 F.3d 1219, 1225 (11th Cir. 2002)(per curiam). "Failure to articulate the reasons for discrediting subjective testimony requires, as a matter of law, that the testimony be accepted as true." Id.

As previously discussed, Plaintiff testified to a number of psychological symptoms at the administrative hearing.  Plaintiff testified that she has trouble remembering things, such as her doctor's appointments, and that her concentration is not very good, which leads her to lose track of the conversation when people are speaking to her.  (R. 472.) She also testified that she tends to isolate herself from other people, that she frequently feels stressed out and anxious, and that she frequently becomes angry when other persons would not.  (R. 472-73.)  When asked by the ALJ what specifically stresses her, Plaintiff replied that her inability to focus and to do the things that others can do causes her to feel that the world is ending.  (R. 473.)

In his written decision, the ALJ concluded that "the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent that they are inconsistent with the above residual functional capacity assessment."  (R. 456.)  He

22

further noted that "[w]hile the medical records indicate that the claimant reports chronic pain, it should be noted that 'chronic pain' and 'severe pain' are not synonymous." (*Id.*) The ALJ also noted that "[a]lthough the claimant has an objectively determined medical condition, the claimant's condition is not of such severity to expect the level of pain that the claimant alleges." (R. 456-57.)

The ALJ extensively reviewed the medical evidence in the record and determined that it did not support Plaintiff's subjective complaints. He included several impairments that related to her mental functioning among Plaintiff's list of severe impairments: "mild mental functional limitations secondary to dysthymia, depression, an anxiety disorder with panic attacks, and a borderline personality disorder." (R. 454.) Furthermore, the ALJ credited Plaintiff's subjective allegations to some degree as evidenced by the fact that he included a mental restriction in the Plaintiff's RFC and in the hypothetical that he posed to the VE.

Further, a review of the ALJ's written decision evidences that the ALJ relied upon and discussed the evidence which supported his conclusion that he did not accept Plaintiff's subjective complaints as credible. For instance, the ALJ relied heavily upon the conclusions of Drs. Nazario, Chodosh, Abeles and Sandrik in making his credibility finding. The ALJ referenced specific conclusions from each of those medical sources as support for his credibility finding. (R. 456.) Drs. Nazario, Chodosh and Sandrik concluded that, although Plaintiff did have some mental functioning limitations and issues, the limitations from those issues were not nearly as disabling as Plaintiff reported. (R. 315-18, 334-40, 676-93.) And while the ALJ might not have included his review of the medical evidence in the same section of the written decision in which he

expressed his findings as to Plaintiff's credibility, the ALJ extensively reviewed and discussed all of the medical evidence in great detail in the prior sections of his written decision.   (R. 449-54.)

Further, Dr. Maida's opinions and Dr. Rocha's opinions – the only two sources of medical evidence in the record which support Plaintiff's subjective allegations –  had major credibility problems. The opinions of Dr. Maida and Dr. Rocha were solicited by Plaintiff's counsel and were based on rather perfunctory, one time interviews or examinations of Plaintiff.  (R. 371-89, 724-31.) The ALJ specifically noted this fact in his written decision and explained in some detail why he rejected both of these sources of medical evidence.  (R. 456–58.)  The ALJ rejected Dr. Maida's conclusions because they were "solicited by the claimant's attorney, and based on a single encounter" and, thus, were "not entitled to substantial evidentiary weight as Dr. Maida only saw the claimant once on behalf of the claimant's attorney, and Dr. Maida is not her treating psychologist."  (R. 458.)  Similarly, the ALJ noted that Dr. Rocha, whose opinion was also solicited by Plaintiff's attorney, had based her findings "based on a knowledge of the claimant consisting of 20 minutes."  (R. 456.)

The medical evidence in the record as a whole supports the ALJ's conclusion with regard to the severity of the mental symptoms and limitations that Plaintiff reported at the administrative hearing.  On numerous visits to the Clinic even though Plaintiff was still experiencing some depressive symptoms  Plaintiff reported that she either felt better than she had previously or that her symptoms were being adequately controlled by the prescribed medications.  (R. 255, 278, 281, 287, 289-95, 613, 698, 705, 706, 711.)  In fact, on at least one visit to the Clinic on November 2, 2008, Plaintiff denied that she had

any depressive thoughts.  (R. 275, 702.)  The record also reflects that Plaintiff also missed several psychotherapy appointments scheduled for her at the Clinic.  (R. 248, 254, 697.)  The progress notes from Plaintiff's one hospitalization in 1996 for psychiatric symptoms disclose  that Plaintiff tended to exaggerate her symptoms.  (R. 179.)  Lastly, Plaintiff's late 2008 psychiatric evaluation at Meridian Behavior Healthcare highlighted the fact that while Plaintiff had some mental health issues, the mental limitations were not nearly as disabling as Plaintiff reported at the administrative hearing.  (R. 747-55.)

In sum, Plaintiff's contention that the ALJ erred in rejecting Plaintiff's subjective complaints regarding her mental symptoms and limitations is without merit.  The ALJ carefully reviewed and relied upon the medical evidence in the record in making his credibility finding and articulated reasons supported by substantial evidence in the record supporting his conclusion that Plaintiff's subjective complaints were not as limiting as she contended.   Accordingly, the ALJ did not err in rejecting Plaintiff's subjective complaints regarding her mental symptoms and limitations.

## V.  RECOMMENDATION

In view of the foregoing, it is respectfully **RECOMMENDED** that the decision of the Commissioner should be **AFFIRMED**.

**IN CHAMBERS** in Gainesville, Florida, on July 18, 2011.

*s / Gary R. Jones*

GARY R. JONES
United States Magistrate Judge

25

## NOTICE TO THE PARTIES

Pursuant to Fed. R. Civ. P. 72(b)(2), a party may file specific, written objections to the proposed findings and recommendations within 14 days after being served with a copy of this report and recommendation.  A party may respond to another party's objections within 14 days after being served with a copy thereof.  Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.